# UNITED STATES DISTRICT COURT
### for the
Eastern District of Tennessee

| | |
|---|---|
| United States of America<br>v.<br>LAMAR PARIS and OLASANYA HARRIS,<br><br>*Defendant(s)* | )<br>)<br>) Case No. 3:23-MJ-1005<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of  June 16, 2022-January 13, 2023  in the county of  Knox  in the
 Eastern  District of  Tennessee , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Possession with the intent to distribute 50 grams or more of methamphetamine, in violation of Title 21, United States Code, Section 841. |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

SA Greg Martin, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 01/13/2023

_____
*Judge's signature*

City and state:  Knoxville, Tennessee   H. BRUCE GUYTON, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

1. I, Gregory Martin, a Special Agent ("SA") with the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), and being duly sworn, depose and state the following:

2. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of, and to make arrest for, offenses enumerated in Title 18, United States Code, Section 2516. I am cross designated and have the authority to conduct Title 21 investigations and enforcement activities. I have been involved with investigations for Title 21 offenses and am familiar with the Interagency Cooperation Agreement between the Drug Enforcement Administration (DEA) and ICE dated June 18, 2009.

3. I have been a Special Agent with Homeland Security Investigations (HSI) since November of 2019. In 2011, I successfully completed the Criminal Investigator Training Program (CITP). In March of 2020 I completed HSI Special Agent Training (HSISAT) at the Federal Law Enforcement Training Academy (FLETC) in Glynco, GA. Prior to my employment at HSI, I was employed as a Special Agent with Internal Revenue Service Criminal Investigation (IRS-CI).

4. I have received extensive training pertaining to narcotic investigations of various crimes that arise from drug trafficking activities. Through my training, conversations with other law enforcement, and my observation experiences in numerous law enforcement investigations, I have become familiar with the methods, operations, and schemes commonly employed by individuals involved in the violation of narcotics statutes. I have investigated many cases in the Eastern District of Tennessee and elsewhere involving violations of state and federal narcotics statutes and, as a result, I have been successful in arresting and convicting numerous individuals

associated with narcotics distribution. I have been involved in the execution of numerous search warrants dealing with the detection and investigation of federal narcotics violations. I have led federal wiretap investigations and have served as the affiant on a Title III wiretap. As a result of these investigations and prosecutions, I have become aware of various methods and techniques utilized by individuals within the Eastern District of Tennessee and elsewhere to sell and distribute controlled substances. I have become aware of various methods and techniques utilized by individuals within the Eastern District of Tennessee and elsewhere to sell and distribute controlled substances. I have become familiar with codes, slang terms, and other terminology used to refer to controlled substances by narcotics traffickers within the Eastern District of Tennessee and elsewhere. I am familiar with the operations of illegal drug trafficking organizations in various parts of the world, including the Eastern District of Tennessee, the Southeastern United States, and Mexico.

5. I am submitting this affidavit for the limited purpose of establish probable cause for the arrest of Lamar Paris ("PARIS"), Olasanya Harris ("HARRIS"), for possession with the intent to distribute 50 grams or more of methamphetamine in violation of Title 21, United States Code, Section 841.

6. The facts in this affidavit are based upon my personal knowledge, as well as knowledge, information, and documentation that I obtained from other law enforcement officers. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include every fact known to me or to other law enforcement officers regarding this matter.

2

Case 3:23-cr-00004-TAV-JEM   Document 1   Filed 01/13/23   Page 3 of 9   PageID #: 3

## Probable Cause

7. On or about June 16, 2022, local law enforcement officers encountered an individual ("CS-1") with approximately one pound of methamphetamine. CS-1[1] revealed that their source of supply was someone that went by the name "Momma-T." That same day, law enforcement arranged to have CS-1 make a controlled purchase of methamphetamine from Momma-T. Law enforcement recorded a call by CS-1 to Momma-T[2] setting up the deal, and then conducted a controlled purchase where law enforcement observed Momma-T selling approximately ½ pound of methamphetamine to CS-1. Law enforcement followed Momma-T back to a nearby hotel room after the controlled purchase from Momma-T. Law enforcement learned from hotel records that Momma-T's real name was Olasanya HARRIS. Pursuant to a state search warrant, law enforcement searched HARRIS' hotel room and recovered the cash paid to HARRIS during the controlled purchase of methamphetamine earlier that day amidst approximately $10,000 recovered in HARRIS' hotel room.

8. Lamar Paris ("PARIS") is HARRIS' drug trafficking partner, and possibly her romantic partner as well. Pursuant to federal border crossing databases, on or about June 27, 2022, HARRIS and PARIS drove back across the border from Canada, after flying to Canada from Jamaica. Customs and Border Protection officers interviewed HARRIS after she crossed the border and she

---

[1] CS-1 in this case is working with law enforcement with the hope of reducing any potential sentence or charges related to narcotics possession. CS-1's information has been reliable and accurate over an extended period of time, including a prior wiretap investigation. CS-1 has prior convictions for methamphetamine possession in 2020, reckless homicide, aggravated burglary, and possession of a weapon by a felon (2013), resisting arrest (2010), aggravated arson (2009), and theft (2008).

[2] CS-1 called telephone number 865-297-6836 to reach HARRIS. This phone was recovered, as noted later in this paragraph, during a search of HARRIS' hotel room. Based on the 865 based area code, the fact that the phone number was in communication with low level users/distributors like CS-1, and the information gleaned from a search of that phone, law enforcement believes that the phone was a distribution phone used by HARRIS and possibly other members of the DTO to sell smaller amounts of methamphetamine to lower-level distributors/users.

3

revealed that she had traveled to Jamaica with her husband, PARIS, to celebrate PARIS' birthday. According to PARIS' driver's license in Michigan his birthday is not in June, but is in December.

9. On or about October 3, 2022, law enforcement was conducting surveillance on HARRIS and a rental car rented by HARRIS in the Eastern of District of Tennessee. HARRIS was observed arriving in the parking lot of an apartment located in western Knoxville ("VICTORIA APARTMENT") before walking towards the front door of the VICTORIA APARTMENT. Law enforcement then observed a male get into the car rented by HARRIS and leave the VICTORIA APARTMENT parking lot. Law enforcement could tell that a male was driving the car but could not tell who that male was because it was dark outside at the time. Law enforcement observed the rental car driven by the male approach a white truck at a gas station. The male got out of the rental car and appeared to interact with an occupant of the white truck. After the white truck left the area, law enforcement conducted a traffic stop of the white truck. Inside the truck were two males and two females, including one person that would become a confidential law enforcement source ("CS-2"). CS-2[3] stated that he had just dropped off approximately $26,000 as payment for drugs including methamphetamine and heroin to PARIS. CS-2 was told by PARIS that PARIS' name was "Chris," but CS-2 identified a photograph of PARIS as the person that he knows as "Chris."

10. On or about October 4, 2022, law enforcement watched and listened to CS-2 place a consensually recorded call to PARIS, who was using telephone number 313-770-7515, hereinafter the "PARIS PHONE."[4] Law enforcement observed CS-2 dial the PARIS PHONE, which was also confirmed in toll records obtained by law enforcement. The following is a portion of that call:

---

[3] CS-2 is cooperating with law enforcement under the belief that their cooperation will potentially reduce a possible sentence and/or charges for drug possession by state authorities. CS-2's information has thus far proved to be accurate and reliable. CS-2 has prior convictions for Assault (1999); Escape (1999); Burglary (2002); DUI (2017); Failure to Appears (2021); Theft (2021); and Maintaining Dwelling for Drug Use (2021).

[4] Pursuant to a federal wiretap, law enforcement intercepted communications by PARIS over the PARIS PHONE for thirty days. During this wiretap, law enforcement intercepted PARIS communicating occasionally about possible drug sales, but law enforcement believes that PARIS largely prefers to conduct his drug related communication

4

> PARIS: I mean if it's not convenient (Unintelligible) but (Unintelligible) ahh. What he was trying to get?
> CS-2: Uh, he wants a couple of em. Probably two or three of the clear, and he's wanting, I don't know, probably a quarter or half the boy.
> PARIS: Uh huh.
> CS-2: And then I'm gonna want…
> PARIS: How much you…(Unintelligible)
> CS-2: Uh well I was gonna see from you what it was gonna cost, I didn't know if maybe if he got those and I had a little money or what we could do uhh. The boy's what kinda threw me off a little bit for the price. The other I know, you know we've talked about three on those but wasn't sure what the boy would be for that.
> PARIS: I mean, you could give me like 70, 60, 70. How much was it?
> CS-2: The boy?
> PARIS: Yea.
> CS-2: No, I'm talking about, I'm not sure what you want to charge him for the half tomorrow or a quarter tomorrow?
> PARIS: Ah nah I'm just saying shit. Ahh you gotta give me sixty a gram. You figure it out, you make the number out. You know what I'm saying?
> CS-2: Alright I got you.
> PARIS: Uhhh…
> CS-2: And then we still at three on a three hundred on the clear?
> PARIS: Yea once we get to grooving it'll get better.

11. Based on my training and experience, as well as the context within this investigation, I believe PARIS asked CS-2 how many ounces of meth the third party wanted to purchase, and CS-2 responded that he wanted two or three ounces ("probably two or three of the clear"). CS-2 stated the third party also wanted to purchase a quarter ounce or half-ounce of heroin ("probably a quarter or half of the boy"). As the call continued, PARIS informed the CS the heroin would cost $60 per gram ("Ahh you gotta give me sixty a gram"). CS-2 then verified the price of meth at $300 per ounce ("we still at three on a three hundred on the clear"), to which PARIS confirmed ("Yea"). PARIS added that as their business continues the price will improve ("once we get to grooving it'll get better").

---

using another phone and/or using end-to-end encrypted communications.

12. On October 19th, 2022, law enforcement used CS-2 to complete a purchase of methamphetamine and heroin from PARIS. CS-2, under the direction of law enforcement, contacted the PARIS PHONE by text message to set up the purchase. PARIS instructed CS-2 to meet in a public bathroom at a Kroger grocery story for the transaction. The CS-2's equipped video and audio recorder captured a meeting with a juvenile male ("JM-1") in the bathroom who exchanged the meth and heroin for cash. The recorder captured JM-1 meeting with the CS-2 for the drug exchange. JM-1 came into the bathroom to meet with the CS. JM-1 asked CS-2 "do you know Chris?" and CS-2 replied "yes". JM-1 handed CS-2 two bags; one containing 93 grams of meth and the other 4.7 grams of heroin.[5]

13. On November 2, 2022, law enforcement utilized CS-2 to arrange another purchase of methamphetamine and heroin from PARIS. CS-2, under the direction of law enforcement, contacted the PARIS PHONE by voice calls to set up the purchase. PARIS instructed CS-2 to go to a local convenience store in Knoxville, TN. CS-2 communicated with PARIS upon his arrival and shortly after another different juvenile male ("JM-2"), who was approximately 13-15 years of age, approached the vehicle CS-2 was in. CS-2 gave JM-2 $2,000 of buy money and JM-2 gave CS-2 two bags, one containing 174 grams of meth and the other 16 grams of heroin.[6] Prior to the deal, law enforcement observed JM-2 leave the TRUMAN RESIDENCE and walk to the local convenience store where the deal occurred.

14. On or about January 13, 2023, law enforcement executed federal search warrants on two locations related this case: the TRUMAN RESIDENCE and the VICTORIA APARTMENT. Law

---

[5] Law enforcement used a handheld Tru Narc device to determine the likely chemical composition of the suspected drugs. Tru Narc is considered to be reliable piece of equipment to determine the likely chemical composition of a suspected illegal substance.

[6] Law enforcement used a handheld Tru Narc device to determine the likely chemical composition of the suspected drugs. Tru Narc is considered to be reliable piece of equipment to determine the likely chemical composition of a suspected illegal substance.

6

enforcement located two juvenile males, and an adult male in the TRUMAN RESIDENCE, along with what appears to be approximately 1 pound of methamphetamine packaged for sale, along with numerous firearms with an estimated $3,000 in cash. One of juveniles at the TRUMAN RESIDENCE is a child of HARRIS. PARIS was seen at the TRUMAN RESIDENCE by law enforcement at approximately noon on January 12, 2023. A picture of at least some of the seized items is shown below:



15. On or about January 6, 2023, at approximately 5:30pm, law enforcement observed HARRIS removing white garbage bags from the VICTORIA APARTMENT into a rental vehicle rented by HARRIS. HARRIS then drove to the TRUMAN RESIDENCE. Once at the TRUMAN RESIDENCE, law enforcement observed HARRIS dumping the white garbage bags into the trash bins at the TRUMAN RESIDENCE. In the last several months, law enforcement has repeatedly observed vehicles driven by HARRIS arrive at the TRUMAN RESIDENCE and stay for extended periods of time.

7

16. On or about January 13, 2023, law enforcement executed a federal search warrant on the VICTORIA APARTMENT. Both HARRIS, PARIS, and two additional males were present inside the VICTORIA APARTMENT. There was firearm ammunition in the closet of the bedroom where HARRIS and PARIS were sleeping. Law enforcement also discovered a large bag of what appears to be marijuana, approximately 13 cell phones, a money counter, and a large amount of cash, in the VICTORIA APARTMENT. Law enforcement has not yet fully counted the cash but it appeared to be approximately $100,000 in cash.

_____
GREG MARTIN, SA
HSI

Sworn and subscribed before me on
January 13, 2023, in Knoxville, TN.

_____
H. BRUCE GUYTON
UNITED STATES MAGISTRATE JUDGE